## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **FRANCIS PELKOWSKI** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Case no.: _____ |
| **FRED HOVERMANN, individually** ) | |
| 8 Leticia St. #501 ) | |
| Philadelphia, Pennsylvania 19106 ) | |
| ) | |
| **KINK, LLC** ) | **JURY TRIAL DEMANDED** |
| 126 Market Street ) | |
| Philadelphia, Pennsylvania 19106 ) | |
| ) | |
| Defendants. ) | |

## PARTIES

**Plaintiff Francis Pelkowski**: ("Pelkowski" or "Plaintiff"): is a resident of the State of New York and is employed by the State University of New York Maritime College as a professor. Plaintiff is also a retired, highly decorated, U.S. Coast Guard Rear Admiral and had 38 years of uniformed service.

**Defendant Fred Hovermann**: ("Hovermann" or "Defendant Hovermann") is, on information and belief, a resident of the State of Pennsylvania, whose home address is 8 Leticia St. #501, Philadelphia, Pennsylvania 19106, and the owner and operator of the Kink Shoppe, a purveyor of adult themed items located at 126 Market Street, Philadelphia, Pennsylvania. The Kink Shoppe Instagram account describes Kink Shoppe as an "Upscale adult toy and fetish boutique. Body-safe products. Educational workshops. Sex-positive. All are welcome".

**Defendant Kink, LLC**: ("Kink Shoppe" or "Defendant Kink Shoppe") is a business entity and Limited Liability Corporation, organized under the laws of the State of Pennsylvania, with a registered office located at 126 Market Street, Philadelphia, Pennsylvania. Kink LLC, which does

business as "The Kink Shoppe" is believed to be solely owned and operated by Defendant Hovermann.

## COMPLAINT

Francis Pelkowski, by and through his undersigned counsel, files this Complaint. Plaintiff hereby states and alleges upon knowledge as to himself and his own actions and information belief as to all other matters as follows:

### NATURE OF THE ACTION

1.      This is a classic case of the abuse of social media and the Internet, to destroy the reputation, integrity, standing and employability of an individual by Defendants who feigned outrage over alleged behavior that was really designed to provide personal gain to the Defendants and enhance their business standing. The facts below show that the Defendants engaged in a ruthless vendetta against a target whose professional life of dedicated service, integrity, commitment and sacrifice stand in stark contrast to the cynical nature of Defendants and the type of  shop they operate.

2.      Defendants, without bothering to investigate the matter, used a trivial and unsubstantiated incident to defame, disparage and harass the Plaintiff, apparently as part of a scheme to drive attention and revenue to their own websites and business enterprise. Defendants' disturbing behavior highlights the asymmetrical power the internet bestows to use its largely unregulated forums to debase, demean and denigrate the object of petty scorn the user seeks to punish.

3.      Plaintiff and Rear Admiral Francis Pelkowski (USCG Ret.) is a well-respected veteran of the U.S. Coast Guard. Pelkowski had an unblemished record during his 38 years of

military service. Following his military career, Pelkowski served as a professor and senior leader at the State University of New York Maritime College.

4.    Plaintiff rose from the ranks of enlisted men to become a flag rank officer, through hard work, diligence, sacrifice and integrity. He possesses numerous accolades and awards including the Defense Superior Service Medal.

5.    Plaintiff made the mistake of entering Defendant's adult shop on October 8, 2019, and purchasing items there with his credit card.

6.    While in the store, Plaintiff saw what he believed was a free sample of a lipstick container. Believing the item to not be for sale and part of a gag-type sample, Plaintiff placed the item in his pocket. He later proceeded to the checkout counter and purchased two items for $77.00, using a credit card under his name.

7.    Defendant then used Plaintiff's credit card information to search for and secure information about Plaintiff, including his current place of employment, his past military history and his overall biography.

8.    Although Plaintiff has never been arrested or even cited for this action, Defendant selectively edited a store surveillance tape to contend that Plaintiff had shoplifted the item. Defendant began an online campaign to destroy Plaintiff, his reputation, his standing in the community, his job prospects, and his military career. Obtaining Plaintiff's military portrait, Defendant published a defamatory and derogatory post that accused Plaintiff of serial and habitual criminality, unfitness and depraved character, and solicited comments from third parties to enhance that message.

9.    Defendant submitted his post and accusations to Plaintiff's employer and to the U.S. Coast Guard in the hopes of destroying Plaintiff's reputation and standing and causing harm

to Plaintiff in his trade, profession, and reputation within the military, maritime industry, and academic communities in which he had served.

10.     Defendants sought to obtain, and did obtain, a commercial benefit from these attacks. Defendants placed them on websites designed to drive traffic to and interest in his adult themed store.

11.     Defendant misappropriated, and then published, Plaintiff's name, portrait, picture, image and likeness in social media postings which included false and defamatory statements regarding Pelkowski's character, causing him severe damage.

12.     The use of the Plaintiff's likeness coupled with defamatory statements were motivated to promote the commerce, publicity and notoriety of Kink Shoppe, which is owned and operated by Defendant Hovermann.

13.     Defendant Hovermann additionally expressed animus against Plaintiff specifically on the basis of his race, sex, and veteran status.  In defending his on-line posts about Plaintiff to readers who found them unfair, Defendant stated, 'this is the due process he gets ... I imagine he's a rich white dude with a lot of prestige who's been very taken care of and has a decent financial padding.  [T]his is a message that he doesn[']t just get to do whatever the eff he wants wherever he wants.  Now he[']s being held accountable and yeah that's gonna be uncomfortable for some people.'  [Errors in original].

14.     Further, Defendants specifically directed social media posts to the State of New York, and the Plaintiff's employer, an industry that Plaintiff affiliates with, and to his professional colleagues' in order to further humiliate Plaintiff.

15.     The severe and continuing reputational damage caused by the publication and re-publication of the defamatory statements in the social media post was foreseeable.

16.    Defendants' actions were and are malicious, intentional, and made with the express purpose of demeaning and degrading Plaintiff.

17.    Plaintiff was a paying patron of Defendant Kink Shoppe.  The notoriety and negative publicity from the social media posts by the Defendants have damaged the Plaintiff's reputation and standing within the community.

18.    Plaintiff seeks declaratory and injunctive relief for the Defendants' violations of his privacy rights, an injunction requiring removal of the offensive posts under the Defendant's control, and compensatory and punitive damages.

## JURISDICTION AND VENUE

19.    Plaintiff is a resident of the State of New York, and of the Eastern District of New York, and is also employed by the State of New York.

20.    Defendant Fred Hovermann is believed to be a resident of the State of Pennsylvania and is the owner and operator of Kink Shoppe, which is located in Philadelphia, Pennsylvania.

21.    While venue could exist where the Defendants reside, the conduct in question was directed towards Plaintiff in New York and was specifically designed to cause harm to Plaintiff in that state. Thus, New York is the appropriate forum.

22.    As to jurisdiction, this court has subject matter jurisdiction based on diversity of citizenship between the defendants, who are citizens or entities located in Pennsylvania and Plaintiff, who is a citizen of this state.

23.    In addition, ample grounds for minimum contacts exist in New York.

24.    First, and most compelling, Defendants specifically directed communications to Plaintiff's employer in the State of New York as part of the defamatory and malicious scheme they

5

concocted to humiliate Plaintiff and to increase online standing and traffic to their commercial enterprise.

25.     Second, Defendant Kink, LLC, maintains a social media presence which reaches New York State.

26.     Third, as part of this scheme, Defendants directed Plaintiff's name, portrait, picture, image and likeness in a social media posting on Instagram to Plaintiff's employer in the State of New York.

27.      Fourth, Defendant Kink Shoppe also has an online store where it regularly sells and ships products to New York State.

28.     Fifth, the intention of Defendants was to cause harm to Plaintiff's employment in the State of New York; thus, Defendants could be expected to be brought into New York for their actions and subject to a cause of action in this state.

29.     This Court has subject matter jurisdiction based on diversity of citizenship because the Parties are citizens of different states, and the amount in controversy exceeds $75,000.  28 U.S.C.A. §1332(a).

**FACTS**

30.     Plaintiff is a faculty member of the State University of New York Maritime College (SUNY Maritime College) where he has served as the Executive Chair of the School of Business, Humanities, and Sciences and as Department Chair of the Global Business and Transportation Department.

31.     Defendant Hovermann is the owner of Kink, LLC, which does business as The Kink Shoppe, and sells items online and ships to New York.

32.     As owner of The Kink Shoppe, Defendant Hovermann is responsible for the Kink Shoppe Instagram account.

6

33.     On October 8, 2019, Plaintiff entered the Kink Shoppe to purchase intimate "gag" gifts.

34.     The Kink Shoppe explicitly advertises itself as a place of discretion. Given the nature of the sales, customers do not anticipate their likenesses being secretly taken for the purpose of having their identities publicly disclosed without their permission.

35.     Plaintiff went through the store looking for gifts to purchase. While perusing the aisles, Plaintiff saw what appeared to be a sample of lipstick.

36.     The item appeared to be a free sample and Plaintiff casually picked it up and placed it in his pocket.

37.     Plaintiff has no criminal history of any kind and had no intention to steal the item or deny the owner of the shop anything of value.

38.     Indeed, Plaintiff spent $77.00 by purchasing two items, and promptly paid for those items with his credit card, that specifically identified him by name and account number.

39.     On information and belief, Defendants used the credit card information not just for the purchase, but to surreptitiously gather additional personal information on the Plaintiff.

40.     Plaintiff stole no items.  Plaintiff's purchase of $77 worth of gag-gift merchandise belies any suggestion that he also stole a piece of merchandise of de minimis value for reasons of either economics or embarrassment.

41.     Plaintiff has not been charged with theft, has not been contacted by any law enforcement or prosecutorial authority and has not been convicted of any crime involving any form of larceny with respect to the Kink Shoppe, or elsewhere.

42.     On October 10, 2019, the Instagram account @kinkshoppe posted on Instagram the following post featuring several visual images including Pelkowski's name, portrait, picture, image and likeness, along with the following statement:

Friends, meet Rear Admiral Francis "Stash" Pelkowski. Rear Admiral Pelkowski retired from the U.S. Coast Guard in 2018. He is currently Department Chair of Global Business and Transportation Dept at SUNY @maritimecollege. In his free time, Rear Admiral Pelkowski enjoys shoplifting from small businesses - specifically testers from sex boutiques, as witnessed in this video. We wish him all the best in his retirement, a sincere thank you for his service, and extreme and utter disappointment in his personal morals. #shoplifting #shoplifter #thief #kinkshoppe #kinkphilly #kinkphiladelphia #kinkpa #oldcity #oldcityphilly #bdsm #kink #adult #sexpositive #allarewelcome #boutique #smallbusiness #shopsmall #shoplocal #military #uscg #cbs3 #cbsphilly #fox29 #fox29goodday #6abcaction #murderedbywords" [Errors in original]

43.    The actual language of the post stated as a factual matter that Plaintiff (1) had engaged in shoplifting; (2) did so for his enjoyment; and (3) implied he had done so against numerous businesses on numerous occasions.

44.    The post explicitly stated that Plaintiff was of low morals and tied that lack of morality into his military service.

45.    The post explicitly identified Plaintiff by both his nickname and name and identified his place of employment.

46.    The post was specifically designed to accuse Plaintiff of criminality, lack of morals and lack of fitness and was broadcast to communities where it might have the most impact on Plaintiff's standing, reputation and employment.

47.    The post was accompanied by a video, and three still visual images, including a screen shot from the video, and Pelkowski's official portrait downloaded from an official U.S. government Coast Guard webpage.

48.    After learning that the Instagram Video had been posted by Defendants, Plaintiff discovered that these lipstick holders actually doubled as a small vibrator.

49.    By including the term "@maritimecollege" within the text of the Instagram message that was posted (see paragraph 15) by Defendant Hovermann, Kink Shoppe purposefully

8

directed the post to the State University of New York Maritime College Instagram account. This created a direct link to Plaintiff's current employer, which is located in Bronx County, New York. This ensured that Plaintiff's employer's Instagram account would receive notification of the post and be able to view it immediately.

50.     Thus, the Instagram post was designed to be, and was in fact, specifically directed toward the State of New York and was designed to interfere with Plaintiff's employment and degrade and humiliate him in the eyes of his peers, management, and students.

51.     By imposing the photograph of the Plaintiff in military uniform, the Defendants expropriated Plaintiff's likeness without his knowledge and permission.

52.     Defendants sought to use the image for commercial gain, intending to increase interest in their business and revenue by using Plaintiff as a foil, to demean, embarrass and humiliate the Plaintiff and to draw attention to his status as a flag-rank retired Coast Guard officer.

53.     Indeed, Defendants made direct communications to Coast Guard Headquarters in the hopes of demeaning Plaintiff directly and interfering with his trade and business reputation and employment.

54.     As a result of this campaign, Plaintiff was compelled to leave certain highly prestigious boards with the U.S. Coast Guard.

55.     He has also been subject to an inquiry by his current employer, the State of New York, and has lost the ability to secure a Dean position with the College where he was and is employed.

56.     As of the date of this Complaint, Defendants' post is still publicly available, and Defendants have taken actions to refresh the post in a way to maintain its high visibility on the internet.

57.     Defendants also have refused to remove the post from the internet, despite being advised of the inappropriate and actionable nature of the post.  Defendants simply ignored a cease and desist demand from Plaintiff sent on October 11, 2019.

58.     Defendants' attempt to maximize the harm to Plaintiff can be seen by their choice of hashtags in the post itself.  By including the hashtags "#military" and "#uscg" the Defendants specifically and intentionally directed the post toward the entire Department of Defense (DOD) and U.S. Coast Guard community including military members, civilian employees, volunteers, and retirees.

59.     The scope of people Defendant intended to reach by adding these addresses is immense. Beyond those specific communities exists the broader professional and collegial community in which the Plaintiff currently operates and hoped to operate at a higher professional level in the future.  Plaintiff is well known as a leader and friend to many in these communities.

60.     As of the date of this Complaint, the Instagram Post attracted over 200 comments and was "liked" over 1,170 times.

61.     In the comment section to the Instagram post, Defendants Hovermann and Kink Shoppe affirmatively replied to several commentators' inquiries regarding the post.

62.     This was done to heighten the web profile of the post, maintain its currency and to promote and enhance the number and scope of the defamatory and derogatory comments regarding Plaintiff.

63.     Defendants provided a platform for and adopted the substance of the ensuing defamatory and derogatory comments, insuring they were publicly published and widely broadcast.

64.     Defendants also cited that Pelkowski had certain professional degrees in state regulated professions. Defendants replied to one post that "Surely someone with both an

engineering degree and a law degree can't be that empty-headed, can they? 🤪 Oh wait, seems they can. 🙈♂️▢"

65.     Hovermann and Kink Shoppe had the option of turning off the comments section in the Instagram post.  Instead, Defendants continued to comment on the post to keep it current. Several examples of Defendants' replies are attached to this Complaint as Exhibit A.

66.     Defendants enhanced the damage by inviting others to disparage Plaintiff's integrity, morals and character and provided the method of publication of those comments.

67.     In comments made to the Instagram post, Pelkowski was called, a "piece of shit," "idiot," "bozo," "pathetic excuse of a human being," "an asshole," "a disgrace," "a disgusting human," "scumbag."

68.     Commenters also made statements such as:

   a.   "Serving the people and country doesn't grant you a hall pass for a lack of morals."

   b.   "Oh wow this guy was smooth too! Def has done this before." [errors in original].

   c.   "Stealing is not cool, especially if you are so involved in the community like this man. Shame on him."

   d.   "I love that you guys have video of him and please drag him through the mud!"

69.     Having incited the internet mob to action, the Defendants set off a chain of events that has been devastating to Plaintiff and has caused him severe distress and grave harm.  Such harm was a reasonably foreseeable result of Defendants' callous and calculated assault on Plaintiff.

70.     The website Reddit, (www.reddit.com) the self-proclaimed "front page of the Internet" is a social news aggregation, web content rating, and discussion site which features user generated posts from many different sources.  It is among the top ten most visited websites in the world by most measures.

11

71.     Reddit has "subreddits" which are smaller user-created boards featuring content focused on a particular topic or theme and names begin with "r/".  Posts or submissions to subreddits are voted on by website users, who "upvote" or "downvote" content.  Upvotes increase visibility and the likelihood that a post will appear on reddit's main page.  Downvotes have the opposite effect.

72.     A Reddit user linked back to the Defendants' Instagram post to the subreddit r/murderedbywords.  That post was titled, "Witnessed the end of a persons career" [sic] and featured a screenshot of the Plaintiff's likeness.

73.     In the comments section to that post, the Defendants posted comments admitting to editing and added the hashtag "#murderedbywords" to the initial Instagram post.  In addition, Defendant Hovermann identified himself as the Kink Shoppe owner, admitted to the editing and republication of the initial Instagram post, and replied to comments that others had made that were demeaning, derogatory and false as they related to the Plaintiff.  Thus, Defendants encouraged, incorporated and republished the false and misleading statements as their own.

74.     Defendant Hovermann also posted the link back to the Instagram post to r/Philadelphia, a subreddit dedicated to the city of Philadelphia, titled "Retired USCG Rear Admiral shoplifts from Philly's Kink Shoppe and gets put on blast."  Defendant Hovermann then commented on his own post "Apparently it's become quite the hit in /r/MurderedByWords"

75.      To further maximize the dissemination of the defamatory and derogatory material, Defendants also directed the Instagram Post toward the CBS, FOX and ABC Philadelphia local television network affiliates.

76.     Defendants' primary purpose in posting its false, misleading, defamatory and derogatory posts by using Plaintiff's full name, nickname, military rank, military appearance, and

position and place of employment was to expose the plaintiff to public hatred, contempt, ridicule or disgrace, through its writings both in its original posts and its comments to those posts.

77.     The statements about the Plaintiff that he was a thief, had stolen on multiple occasions from multiple smalls businesses, that he lacks morals and that he enjoys engaging in theft were untrue, false and misleading and were also substantially untrue at the time they were made and at the times they have been republished or commented upon by Defendants.

78.     At the time the statements were made, no charges had been filed against the Plaintiff; no civil action had been brought by defendants against him and there was no evidence that Plaintiff had intended to actually steal any item from any store including Defendants' store. Defendants had no evidence that he lacked morality or integrity. Defendants had no knowledge that his military service had been other than exemplary. Defendants knew but intentionally or negligently failed to disclose that they believed the item was stolen

79.     Having failed to even try to respond to Plaintiff or the letter Plaintiff's initial counsel sent to Defendants, it is clear that Defendants initially made and then recklessly and/or intentionally continued to post their defamatory statements with a disregard for the truthfulness or lack of truthfulness of their claims.  Plaintiff had openly paid for two other much more expensive items at the store with a credit card, which negates the idea that he was shoplifting.

80.     The evidence is clear that the Plaintiff was not charged or prosecuted, Defendants never sought to contact the Plaintiff regarding their alleged claim and merely assumed from their selective viewing of a security tape, that they could use the Plaintiff to create a public controversy by demeaning Plaintiff with the express hope of enhancing their own business standing.

81.     Plaintiff's military rank and standing, especially as a career reserve officer, do not necessarily render him a "public figure" and he has taken no action since the outset of the matters giving rise to this suit to interject himself into the public forum.  Defendants evidenced their clear

expression of disdain for the Plaintiff's alleged immoral character and lack of intelligence, in such a manner as to prove actual malice.

82.     Defendant commercially promoted Kink Shoppe in their libelous and written communications, they tracked the post to the store website using their defamatory statements on posts on Instagram and Reddit. (Exhibit B).

83.     The Defendants' Instagram Post was later posted to YouTube.  That video also features the Plaintiff's official portrait and identifies the Plaintiff by name and has been viewed over 300,000 times and received over 24,000 likes. (Exhibit C).  This video was filmed and uploaded in the State of New York.

84.     As a result of the above conduct, Plaintiff has suffered widespread, nationwide damage to his reputation and professional standing.

85.     As a result of such actions the Defendants have been enriched by their improper conduct, partly through using Plaintiff's likeness.

86.     Defendants actions were both negligent and grossly negligent of the facts and appear to have been done with malicious intent and a reckless disregard for the truth of the claims.

87.     Defendant Hovermann additionally expressed in writing that he was motivated to harm Plaintiff on the specific basis of his race, sex, and veteran status.

**SUMMARY CONCLUSION**

88.     Plaintiff served our Nation honorably and well for thirty-eight years.  He made the mistake of entering Defendants' sex shop to purchase some gag gifts.  Defendants first recorded him, next misappropriated an image of him in uniform without his permission, and then knowingly and willfully destroyed his reputation, by defaming him with actual malice, in an cheap attempt to

increase business for their business, and out of stated animus for Plaintiff's race, sex and veteran status.  Sadly, that bell cannot now be un-rung.

89.    While unfortunately no action by this Court can make Plaintiff fully whole again, he is entitled to significant damages.  And Defendants need to be held to account for their bad acts, in the interests of both justice and the deterrence of future similar misconduct.

## COUNT I: LIBEL/DEFAMATION

90.    By this reference, the allegations contained in the preceding paragraphs are reincorporated here as if fully set forth.

91.    To prevail on a libel claim under New York law, a plaintiff may show (1) a written defamatory factual statement of and concerning the plaintiff by a defendant; (2) publication to a third party by defendant; (3) fault by defendant; (4) falsity of the defamatory statement; (5) special damages and/or per se actionability; and (6) a lack of protection by privilege held by defendant.

92.    The October 10, 2019, Instagram post and related comments by the Defendants contained false statements of fact regarding the Plaintiff, which were published to third parties.

93.    The statements were of and concerning the Plaintiff.

94.    The specific statements made by Defendants that were false or misleading or were substantially false and misleading were:

a.    In his free time, Rear Admiral Pelkowski enjoys shoplifting.

b.    In his free time, Rear Admiral Pelkowski enjoys shoplifting from small businesses.

c.    In his free time Rear Admiral Pelkowski enjoys shoplifting from small businesses—specifically testers from sex boutiques, as witnessed in this video.

d.    "We wish him all the best in his retirement, a sincere thank you for his service, and extreme and utter disappointment in his personal morals."

15

e.   The use of the hashtags #shoplifting #shoplifter #thief"

95.     Defendant(s) statements alleged that the Plaintiff engaged in a crime and enjoyed criminal activity generally against multiple entities. These statements were untrue, substantially untrue, and made with a reckless and knowing disregard for the truth and constitute libel and defamation *per se.*

96.     Defendants sought to sensationalize and draw attention to the post by later including #murderedbywords.

97.     Defendants' statements exposed the Plaintiff to public contempt, ridicule, aversion, or disgrace, to induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly interaction within society.

98.     Defendants' statements, to the extent they were not direct statements of libel or slander, implied that Plaintiff was a criminal, a person of low moral fiber and one who lacked personal ethics.

99.     Defendants directly stated or implied that he was a disgrace to the Coast Guard and had besmirched his standing at the Maritime College.

100.     The accusation that Plaintiff had engaged in criminal conduct at more than one location was both an explicit and implied statement that Plaintiff was a criminal and was a habitual serial criminal, who "enjoyed" his criminal conduct.

101.     The use of hashtags defining Plaintiff as a shoplifter and the use of the term "thief" were libelous and slanderous *per se*.

102.     These statements further implied that Plaintiff was both a criminal and enjoyed his criminality.

103.    The fact that Defendants sought to link Plaintiff's conduct to his use of an adult shop, even one Defendants owned and operated, was designed to state directly or imply a lack of moral fitness in the Plaintiff.

104.    Indeed, Defendants' entire scheme was to demean the Plaintiff and destroy his personal and business reputation, permanently and nationwide.

105.    Defendants neither notified the Plaintiff of their intent to publish the defamatory and libelous statements, nor gave him any opportunity to explain or defend himself.  Defendants ignored Plaintiff's request to remove the posts and never sought Plaintiff's permission, consent or commentary before publishing the libelous and defamatory material.

106.    Defendants' words were widely published to the communities in which Plaintiff was employed, to the U.S. Coast Guard where he held a senior commission and posts that included assisting on selection panels, and to the general public.

107.    Defendants specifically targeted these communities to maximize the harm to Plaintiff.

108.    The Defendants' republication and addition of comments to defamatory and derogatory posts that demeaned, defamed and libeled the Plaintiff created separate acts of libel for each and every day the Defendants have maintained and refreshed the posts.

109.    Plaintiff has not been charged with a criminal offense, nor was he convicted of a criminal offense.  Further, Plaintiff did not commit a criminal offense.  He did not take an item of commercial value with the intent to deprive the owner thereof.  This is demonstrated by his contemporaneous purchase of $77 worth of goods via credit card, and the comparatively de minimis value of the apparently free tester item he accidentally and mistakenly did not pay for. Defendants knew of the contemporaneous purchase.

110.    Defendants knew or should have known that flag rank officers such as Plaintiff routinely seek and obtain senior positions in the public and private sectors, are often given directorships on boards and committees, or are asked to lecture to the private sector, to federal and state governments or to veterans groups.

111.    Allegations of criminality or moral unfitness or which denigrate a person in their trade and profession, are defamatory and libelous *per se* and damages are presumed.

112.    To the extent the Plaintiff were to be considered a public figure, the Defendants' statements were made with actual and Constitutional malice, as they knew Plaintiff had not shoplifted the $77.00 worth of items he contemporaneously purchased, as well as the *de minimis* value of the item taken.

113.    Defendants' publications were also libel *per quod,* as the writing clearly stated that Plaintiff lacked moral character, was a disgrace to the U.S. Coast Guard, and to his employer, was both criminal in conduct and nature, and that Plaintiff is psychologically disturbed and lacks integrity and moral fiber.

114.    Under these circumstances, Plaintiff is entitled to both actual damages and punitive damages in an amount to be proven at trial, and to injunctive relief.

115.    Plaintiff is also entitled to the disgorgement of any ill-gotten gains obtained by Defendants jointly and severally as a result of the defamation.

116.    As Defendants appear to be alter egos of one another and the business is expected to be undercapitalized, Plaintiff requests that the court pierce the corporate veil as to any damages.

## COUNT II: TORTIOUS INTERFERENCE WITH EMPLOYMENT CONTRACT: NEW YORK MARITIME COLLEGE

117.    By this reference, the allegations contained in the preceding paragraphs are reincorporated here as if fully set forth.

118.    To prevail on a tortious interference with contract claim under New York law, a plaintiff may show (1) the existence of a contract between plaintiff and a third party; (2) a defendant's knowledge of that contract; (3) defendant's intentional inducement of a breach of that contract; (4) a breach by the third party; (5) but for defendant's actions, that contract would not have been breached; and (6) damages.

119.    At the time Defendants directed their defamatory, demeaning and derogatory posts concerning Plaintiff, they knew that Plaintiff had a contract of employment with SUNY Maritime College.

120.    The Defendants' actual knowledge of the Plaintiff's employment by and employment contract with the State University of New York, Maritime College is evidenced by the facts that they knowingly, intentionally, and maliciously directed their communications about Plaintiff directly to the University.

121.    Defendants did tortuously and wrongfully seek to interfere and did interfere with Plaintiff's employment relationship and employment contract by publishing negative comments that suggested the Plaintiff had engaged in serious criminal conduct, lacked integrity, got deviant pleasure from criminal conduct against small businesses and was morally unfit to hold a position of employment.

122.    Defendants knew that the specific type of employment that Plaintiff held was

particularly susceptible to allegations of immorality, particularly as it related to sexual issues.

123.   Defendants invited and encouraged third parties to notify Plaintiff's employer of their concerns regarding the Plaintiff's fitness for employment.

124.   Indeed, the express purpose of the Defendants was not to deter any alleged wrongdoing, through legitimate means, but to ensure that the Plaintiff was humiliated for conduct that, if true and if proven, would only involve a minor misdemeanor offense,

125.   Defendants did not wait for a determination on the veracity of their claims, they made no attempt to contact the Plaintiff or respond to his counsel, and there was no criminal prosecution either in play or any criminal conduct proven, which could have arguably supported the premise that the Plaintiff engaged in underlying misconduct.

126.   The Defendants made follow-up comments on Instagram and Reddit, which are effectively re-publications of defamatory, demeaning and derogatory statements of and concerning the Plaintiff, Plaintiff's moral fitness, Plaintiff's intellect and his propensity toward criminality: Defendants called Plaintiff "empty headed" and monitored and commented on Instagram posts to raise awareness of the attention that the post had received on Reddit.

127.   The Defendants' comments and publication were specifically directed toward the Plaintiff's current and former employers.  The comments were of and concerning the Plaintiff and were aimed at social media sites actively used by faculty, students and the general public (Instagram, Reddit, YouTube).

128.   The Defendants' comments and publication were also specifically directed toward the Plaintiff's professional community and prospective employers.  The comments were of and concerning the Plaintiff and were reposted to social and professional media sites actively used by maritime industry professionals, e.g., "gCaptain.com" which is the leading online destination of maritime and offshore professionals, hosting over 600,000 visitors per month. Maritime industry

jobs worldwide are advertised on this site.   Over 57,700 maritime professionals receive the gCaptain daily newsletter. The video that Defendants created and posted on Instagram was reposted numerous times on the gCaptain.com Forum.

129.    The Defendants' comments and publication were specifically directed toward the Plaintiff's alma mater, SUNY Maritime College, whose alumni represent a significant portion of the maritime industry employers in the United States, and therefore the prospective employers of Plaintiff.   The comments were of and concerning the Plaintiff and were reposted to social and professional media sites actively used by SUNY Maritime alumni. As one example, "Fort Schuyler Shipmates" is a Facebook page which has 4,049 members who are alumni of SUNY Maritime College. The video that Defendants created and posted on Instagram was reposted numerous times on "Fort Schuyler Shipmates."

130.    Due to the humiliation from Defendants' defamatory comments and damage to his reputation which reduced the effectiveness of Plaintiff in his job, the Plaintiff resigned from his position as Executive Chair of the School of Business, Humanities, and Sciences and as the Department Chair of the Global Business and Transportation Department.

131.    The Plaintiff also lost the opportunity to become a Dean at the College, which resulted in a loss of pay and status.

132.    Defendants did tortiously and intentionally interfere with a known contractual relationship to the detriment and harm of the Plaintiff.

133.    Defendants did so either intentionally, with actual knowledge that they would disrupt or hope to disrupt the contractual relations or negligently, with reckless disregard for the reasonably foreseeable consequences of their actions.

134.    Defendant Hovermann additionally expressed in writing that he was motivated to harm Plaintiff on the specific basis of his race, sex, and veteran status.

135.     Defendants' actions had a negative impact on the Plaintiff's salary and was a direct result of the loss of respect and standing in the SUNY Maritime College community and maritime industry which persists months after the Defendants' post.

### COUNT III: TORTIOUS INTERFERENCE WITH EMPLOYMENT: U.S. COAST GUARD

136.     By this reference, the allegations contained in the preceding paragraphs are reincorporated here as if fully set forth.

137.     Defendants knew or should have known that Plaintiff, as a retired Coast Guard officer, could be subject to recall for discipline and removal from the reserves as a result of an accusation of criminal misconduct, moral unfitness or a lack of integrity.

138.     Defendants directed their communications to the U.S. Coast Guard, the public and the military community in the hopes that it would demean and ridicule Plaintiff in those communities.

139.     Defendants knew or should have known that Plaintiff served on certain boards with the Coast Guard due to his senior rank and that their actions could or would interfere with his holding such positions.

140.     As a result of the Defendants' actions Plaintiff was forced to voluntarily resign from his position with the Coast Guard Academy Board of Trustees and was even subject to investigation by the Coast Guard Investigation Service for conduct that could have discredited the Coast Guard.

141.     The rationale for the investigation was not based on the underlying conduct asserted by the Defendants per se, but on the notoriety Defendants had created by the massive publication of their false, misleading, degrading and demeaning depictions of Plaintiff and their express use of both his military rank and his image in military uniform.

142.    Defendants conduct was malicious, intentional and/or grossly negligent and reckless.

143.    Defendant Hovermann additionally expressed in writing that he was motivated to harm Plaintiff on the specific basis of his race, sex, and veteran status.

**COUNT IV: INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS**

144.    By this reference, the allegations contained in the preceding paragraphs are reincorporated here as if fully set forth.

145.    To prevail on a tortious interference with prospective business relations claim under New York law, a plaintiff may show (1) a defendant's interference with business relations existing between the plaintiff and a third party, with (2) means that are dishonest, unfair, or in any way improper.

146.    Defendants knew or should have known that their actions would interfere with prospective business relations that the Plaintiff would likely obtain as a result of his position as a licensed Master Mariner, senior business executive, professor, and as a retired rear admiral in the Coast Guard Reserve.

147.    Indeed, Defendants intentionally and maliciously directed their defamatory, false and misleading statements and accusations of Plaintiff's lack of moral fitness and criminality to Plaintiff's current and former employers and to a wider audience in the communities in which the Plaintiff was most likely to secure business and economic opportunities.

148.    Thus Defendants targeted their posts to the U.S. Coast Guard, to the State University of New York and its Maritime College and to the public at large, with the specific purpose to humiliate the Plaintiff and in the hopes that it would lead to the loss of his employment and business opportunities.

149.    Defendants also hoped that maligning and humiliating Plaintiff, including by

posting his image in uniform, would drive interest to their website and produce commercial gain through the unauthorized use of Plaintiff's likeness.

150.    Defendants acted with actual malice or a reckless disregard for the consequences of their dissemination of scandalous, fraudulent and false statements regarding Plaintiffs conduct and fitness.

151.    Defendants hoped to create and did create economic pressure on third parties who might hope to enter business relations with Plaintiff. Indeed, the whole point of the Defendants' scheme was to ruin Plaintiff based on Defendants' false and hyperbolic descriptions of Plaintiff and his conduct.

152.    Defendant Hovermann additionally expressed in writing that he was motivated to harm Plaintiff on the specific basis of his race, sex, and veteran status.

153.    Wherefore, Plaintiff has been severely damaged in his ability to secure new business relationships for which the Defendants are liable.

**COUNT V: INVASION OF THE RIGHT OF PRIVACY (N.Y. Civ Rts. §§ 50-51)**

154.    By this reference, the allegations contained above are reincorporated here as if fully set forth.

155.    To prevail on a violation of privacy claim under New York Civil Rights Law §§ 50-51, a plaintiff may show (1) a defendant's usage of plaintiff's name and picture; (2) within the state of New York; (3) for defendant's purposes of advertising or trade; (4) without plaintiff's written consent.

156.    New York recognizes a private right of action for misuse of a name, likeness, picture or portrait for commercial purposes without permission.

157.     Specifically, New York Civil Rights Law (NYCRL) authorizes equitable relief and money damages for unauthorized use of a person's name, portrait, or picture and NYCRL Section 51 provides in relevant part:

> Any person whose name, portrait or picture is used within the state for advertising purposes or for the purposes of trade without the written consent first obtained as above provided [in section 50 NYCRL] may maintain an equitable action ... against the person, firm or corporation so using his name, portrait or picture, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use…

158.     The video and screen shots use Plaintiff's name, portrait, picture, image and likeness purporting to show him, including his official U.S. Coast Guard portrait in uniform, in a negative way.  This is an illegal use of Plaintiff's image.

159.     Defendants used these images for commercial gain.  They hoped to use the notoriety of the Plaintiff and his accomplishments as a flag rank officer, to drive traffic to their websites and interest in their store.  They also hoped to raise their own standing by demeaning Plaintiff.

160.     The unauthorized use of an official Coast Guard photo by a private entity for commercial purposes is also a misappropriation of a Department of Homeland Security/Department of Defense visual image.

161.     The Defendant's use of the hashtag #uscg, specifically directed the post to the official U.S. Coast Guard Instagram account.  In this way, Defendants directed the post directly to the community in which Plaintiff lives and works, operates professionally, and would have sought employment opportunities from.

162.     Defendants knew or should have known that flag rank officers such as Plaintiff routinely seek and obtain senior positions in the public and private sectors, are given directorships

on boards and committees or are asked to lecture to the private sector, to federal and state governments or to veterans' groups.

163.    These images and video were posted to the social media platform Instagram, for the purposes of gaining publicity, advertising and trade.   This is evidenced using the same promotional language on the website for Kink Shoppe, and the same promotional phrases used on its other social media accounts.

164.    The posts containing the images and video contained negative derogatory and demeaning statements about Plaintiff by the Defendants.   The post and comments section contained specific and highly negative comments about the Plaintiff.

165.    By posting them on Instagram, Defendants intended the images to be used within the State of New York, as they undisputedly, simultaneously exhibited images both globally and locally. *Molina v. Phoenix Sound Inc*., 297 A.D.2d 595, 747 N.Y.S.2d 227 (1st Dept. 2002).  The images were also later used by others, without Plaintiff's authorization.

166.    Defendants Hovermann and The Kink Shoppe did not seek or obtain Plaintiff's permission to use his name, portrait, picture, image and likeness for commercial purposes.

167.    Defendants Hovermann and The Kink Shoppe used the Plaintiff's name, portrait, picture, image and likeness for commercial purposes and to achieve publicity and pecuniary gain.

168.    Defendants' misuse led to considerable damage to the Plaintiff's reputation amongst current and prospective employers and in the professional community to which Plaintiff belongs.

169.    Plaintiff is entitled to damages, a constructive trust, disgorgement of all ill-gotten gains and injunctive relief.

## COUNT VI: UNJUST ENRICHMENT

170.     By this reference, the allegations contained above are reincorporated here as if fully set forth.

171.     To prevail on an unjust enrichment claim under New York law, a plaintiff may show that a defendant (1) benefitted at plaintiff's expense, and (2) that equity and good conscience require restitution by defendant.

172.     The above acts taken by Defendants were designed to create an economic benefit to Defendants by raising the profile and profitability of their store and enhancing their own personal and business standings by publishing denigrating images, depictions and facts about Plaintiff, to communities the Defendants hope to attract business from, including the general public.

173.     Defendants specifically linked their post to their business and used a video of their business setting to entice interest in that business by discrediting Plaintiff.

174.     Defendants used Plaintiff's image, employment history and military status, without his permission or consent.

175.     The publication of such matters was linked to alleged criminal conduct by Plaintiff.

176.     The use of the image of Plaintiff, the references to his military career, were added to not only depict the Plaintiff as a morally decrepit fraud, but to draw interest to the Defendants' business and its website.  They were done then primarily for commercial gain.

177.     The Defendants offer express discretion in the business that is conducted in their store and thus, the Plaintiff had a reasonable expectation that he would not be publicly identified as a patron of the store or that his image would be secretly recorded and used for Defendants' commercial advantage.

178.    As Pennsylvania is a two-party consent state under applicable state laws concerning wiretapping, the Plaintiff had a reasonable expectation that if he was being recorded to be used in advertising it would be disclosed to him.  Similarly, the Plaintiff had a reasonable expectation that his portrait, picture, image and likeness would not be appropriated by the Defendants for commercial purposes.

179.    Defendants knowingly, intentionally or with reckless disregard sought to seize an opportunity to embarrass a senior retired military officer in order to gain publicity and attention for the Defendant Kink Shoppe.  The hashtags used in the posts, directly linked readers and viewers to the Kink Shoppe store.  The hashtags used on the post are also phrases used in advertising for the Kink Shoppe store.

180.    The publicity and attention from the post which used Plaintiff's name, portrait, picture, image and likeness without permission from Plaintiff benefitted the Kink Shoppe by directing traffic to its website and social media accounts.  In these ways, the Defendants received an unfair commercial benefit at the Plaintiff's expense.

181.    It is against equity and good conscience to permit Defendants to engage in continued use of the Plaintiff's likeness for advertising, publicity, or commercial gain.

182.    It is against equity and good conscience to permit the Defendants to engage in continued harassment and cyberbullying of the Plaintiff.

183.    The Defendants, in addition to any other damages should be required to account for and disgorge all business profits or commercial gain they have obtained as a result of their tortious conduct.

184.    The Defendants' revenues and profits following these posts should be held in constructive trust, so as to not allow them to dissipate their ill-gotten gains or make expenditures without notice to the parties and approval by the Court.

## COUNT VII: RIGHT TO PRELIMINARY AND PERMANENT INJUNCTION

185.    By this reference, the allegations contained above are reincorporated here as if fully set forth.

186.    The continued presence of the October 10, 2019, post on the Instagram is causing continuous and ongoing harm to the Plaintiff's reputation and livelihood. Plaintiff not only is employed by SUNY Maritime College, but he has also provided fee-based consulting services over the last ten years. There have been no requests by members of industry or government for Plaintiff to provide consulting services since the video was posted on October 10, 2019, which is highly unusual.  The post is one of the top search results that appears upon entering the Plaintiff's name into various search engines. This post appears above many positive search results about the Plaintiff's 38 years of military service and faculty position at SUNY Maritime College.

187.    The post has caused irreparable harm to the Plaintiff's reputation and is one of the main results returned by an internet-based search of his name.

188.    Removal of the post is the only way to prevent the continuous negative effect the Instagram post has on the Plaintiff's internet presence, and in the absence of such injunctive relief, the Plaintiff will continue to suffer irreparable harm.

189.    The Plaintiff cannot be adequately compensated by money alone for the damage to Plaintiff's reputation caused by the post because money alone will not cure the ongoing harm to his reputation caused by the continued availability of the post.

190.    Under the circumstances, equitable relief is appropriate, in the form of immediate removal of the post, and the references to the post on other sites.   Defendants must remove the post and any other negative content within the Defendant's control.  In addition, Defendants must use their best-efforts to have members of the internet community remove any reposting of Defendants post and comments, and have negative content removed to the extent practicable.

191.     Plaintiff seeks preliminary and permanent injunctive relief, and other equitable relief, in light of the preceding circumstances.

## PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiff prays for the following:

1.     As to Count I, Plaintiff  seeks a finding of defamation and libel per se, and damages for libel, defamation per quod and per se for amounts to be determined at trial, as well as punitive damages, injunctive relief, and an award of all attorneys' fees and costs incurred in the preparation and presentation of the suit.  Plaintiff also seeks damages for emotional distress and pain and suffering for the wrongful conduct cited in Count I.

2.     As to Count II, Plaintiff seeks damages for all harm caused by the intentional and/or negligent interference with contractual relations with the State of New York, and the Maritime College, for an amount to be determined at trial and for punitive damages, as well an award of all attorneys' fees and costs incurred in the preparation and preparation of the suit.  Plaintiff also seeks recovery of all costs and attorneys' fees expended in responding to any inquiry brought by his employer as the result of the Defendants conduct.

3.     As to Count III, Plaintiff seeks damages for all harm caused by the intentional and/or negligent interference with contractual relations with the U.S. Coast Guard for an amount to be determined at trial and for punitive damages, as well an award of all attorneys' fees and costs incurred in the preparation and preparation of the suit.  Plaintiff also seeks recovery of all costs and attorney's fees expended in responding to any inquiry brought by his employer and the Coast Guard Investigative Service as the result of the Defendants conduct.

4.     As to Count IV, Plaintiff seeks damages for all harm caused by the intentional and/or negligent interference with prospective interference with business relations for an amount

to be determined at trial and for punitive damages, and an award of all attorneys' fees and costs incurred in the preparation and preparation of the suit.

5.      As to Count V, Plaintiff seeks damages for the invasion of privacy and the misuse of his image in an amount to be determined at trial, including damages for emotional distress and pain and suffering, as well as preliminary and permanent injunctive relief,  punitive damages and an award of all attorneys' fees and costs incurred in the preparation and presentation of the suit.

6.      As to Count VI, Plaintiff seeks a disgorgement of all improper and ill-gotten gains, a constructive trust overall revenues received since the posting of the offending comments and images, attorneys fees and costs incurred in preparing and presenting this suit and if required piercing of the corporate veil to insure proper maintenance of all funds in a constructive trust.

7.      As to Count VII, Plaintiff seeks a temporary and permanent injunction, deletion of offending posts, retraction of the offending claims, notice to any third parties where the posts were disseminated that they have been removed and that Plaintiff engaged in no misconduct of any kind. An award of pre- and post-judgment interest, and his costs of suit and attorneys' fees.

8.      The Defendants are each jointly and severally liable for the conduct described above and liability should be imposed jointly and severally.

9.      For other such relief as the Court deems just and equitable under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all Counts.

DATED: April 17, 2020

        /s/ Paul T. Hofmann
Paul T. Hofmann (PH1356)
Hofmann & Schweitzer
212 W. 35th Street, FL 12
New York, NY 10001
T: (212) 465-8840
F: (212) 465-8849
paulhofmann@hofmannlawfirm.com

        /s/  Kevin Byrnes
Kevin Byrnes *(Pro Hac Vice Pending)*
FH+H, PLLC
1751 Pinnacle Drive
10th Floor
Tysons, Virginia 22102
T: (703) 590-1234
F: (703) 590-0366
kbyrnes@fhhfirm.com
Attorneys for the Plaintiff